# In the United States Court of Federal Claims

No. 10-416 C
(E-Filed: August 11, 2010 Under Seal)
(Refiled: August 25, 2010)[1]

_____ )
                                           )
HOMESOURCE REAL ESTATE ASSET               )
SERVICES, INC.,                            )
                                           )
              Plaintiff,                   )
                                           )
v.                                         )
                                           )
THE UNITED STATES,                         )
                                           )
              Defendant                    )
                                           )
      and                                  )
                                           )
BLB RESOURCES, INC.,                       )
                                           )

Post-Award Bid Protest;
Standing; Supplementation of the
Administrative Record; Past
Performance Rating;
Responsibility Determination;
Technical Evaluation;
Competition Limited to
Federal Supply Service Schedule
520 Contractors

---

[1]This Opinion was filed under seal on August 11, 2010. The court requested that if any party believed that the August 11, 2010 Opinion contained protected material that should be redacted before publication, that party shall, by motion filed on or before August 23, 2010, request that such protected material be redacted. Now before the court are Defendant's Motion to Redact Protected Material From Published Opinion (defendant's Motion to Redact), Docket Number (Dkt. No.) 53, filed August 12, 2010; Intervenor Ofori & Associates, P.C.'s Motion to Redact Protected Material from Sealed Opinion (Ofori's Motion to Redact), Dkt. No. 55, filed August 23, 2010; Intervenor HomeTelos's Motion to Redact Protected Material From Sealed Opinion (HomeTelos's Motion to Redact), Dkt. No. 56, filed August 23, 2010; and Plaintiff HomeSource Real Estate Asset Services, Inc. Motion to Redact Protected Material From Sealed Opinion (plaintiff's Motion to Redact), Dkt. No. 57, filed August 23, 2010 (collectively Motions to Redact). The court now GRANTS the Motions to Redact with respect to its alternative holding that plaintiffs' protest is WITHOUT MERIT, and publishes the Opinion as so redacted. With respect to its primary holding, that plaintiff LACKS STANDING, the Motions to Redact are DENIED, except that defendant's Motion to Redact is GRANTED to the extent it relates to non-party offerors. Redactions are indicated by [***].

|                          |   |
|--------------------------|---|
| Defendant-Intervenor,    | ) |
|                          | ) |
| and                      | ) |
|                          | ) |
| HOMETELOS, LP,           | ) |
|                          | ) |
| Defendant-Intervenor,    | ) |
|                          | ) |
|                          | ) |
| and                      | ) |
|                          | ) |
| OFORI & ASSOCIATES, P.C.,| ) |
|                          | ) |
| Defendant-Intervenor.    | ) |
|                          | ) |
| _____ | ) |

Janine S. Benton, Falls Church, VA, for plaintiff.  John M. Murdock and Kathy C. Porter, Falls Church, VA, and James S. DelSordo, Manassas, VA, of counsel.

Joseph E. Ashman, with whom were Tony West, Assistant Attorney General, Jeanne E. Davidson, Director, and Alan J. Lo Re, Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, for defendant.  Todd P. Maiberger and Tara Kilfoyle, Office of the General Counsel, Department of Housing and Urban Development, Washington, DC, of counsel.

John G. Horan, Washington, DC, for BLB Resources, Inc., defendant-intervenor. Marques O. Peterson, Washington, DC, of counsel.

J. Alex Ward, Washington, DC, for HomeTelos, LP, defendant-intervenor.  Leslie H. Lepow, Eric R. Haren and Damien C. Specht, Washington, DC, of counsel.

Joseph P. Hornyak, McLean, VA, for Ofori & Associates, P.C. defendant-intervenor. Jacob W. Scott and Megan Mocho Jeschke, McLean, VA, of counsel.


## ORDER AND OPINION

HEWITT, Chief Judge

2

This is a post-award protest brought by HomeSource Real Estate Asset Services, Inc. (HomeSource or plaintiff), an unsuccessful offeror in Solicitation R-OPC-23441 (Solicitation) issued by the United States government acting through the United States Department of Housing and Urban Development (HUD, the government or defendant).

I.      Background

        A.      Procedural Background

        Plaintiff filed its Complaint for Injunctive and Declaratory Relief (Complaint or Compl.), Docket Number (Dkt. No.) 1, on June 30, 2010.  On July 1, 2010, the court granted a Motion to Intervene filed by BLB Resources, Inc. (BLB), Dkt. No. 15.  The court held a Telephonic Status Conference (TSC) with counsel for plaintiff, defendant and defendant-intervenor BLB on Thursday, July 1, 2010, and issued its scheduling order pursuant to the TSC.[2]  Order of July 1, 2010, Dkt. No. 14.  The government filed a copy of the Administrative Record (AR) with the court on July 2, 2010.  On July 7, 2010, the court granted a Motion to Intervene filed by HomeTelos, LP (HomeTelos), Dkt. No. 20. The court held a second TSC on Wednesday, July 7, 2010 with counsel for plaintiff, defendant, defendant-intervenor BLB and defendant-intervenor HomeTelos and issued a second scheduling order on July 7, 2010 pursuant to the second TSC.  Order of July 7, 2010, Dkt. No. 22.  On July 14, 2010, the court granted a Motion to Intervene filed by Ofori & Associates, P.C. (Ofori), Dkt. No. 29.

        Now before the court are plaintiff's Amended Complaint for Injunctive and Declaratory Relief (plaintiff's Amended Complaint or Pl.'s Am. Compl.), Dkt. No. 24, filed July 12, 2010; Plaintiff's Statement of Facts in Support of Its Motion for Judgment on the Administrative Record (plaintiff's Facts or Pl.'s Facts), Dkt. No. 25, filed July 12, 2010; Plaintiff's Motion for Judgment on the Administrative Record (plaintiff's Motion or Pl.'s Mot.), Dkt. No. 27, filed July 12, 2010; and Plaintiff's Memorandum in Support of Its Motion for Judgment on the Administrative Record (plaintiff's Memorandum or Pl.'s Mem.), Dkt. No. 28, filed July 12, 2010.

        Defendant's Motion for Judgment Upon the Administrative Record and Response to Plaintiff's Motion for Judgment Upon the Administrative Record (defendant's Motion or Def.'s Mot.), Dkt. No. 34; Intervenor HomeTelos's Cross Motion for Judgment on the Administrative Record (HomeTelos's Motion or HomeTelos's Mot.), Dkt. No. 37; and

_____

        [2] The court's Order of July 1, 2010 adopted expedited briefing, in light of which the court found plaintiff's Motion for Preliminary Injunction and plaintiff's Application for Temporary Restraining Order MOOT.  Order of July 1, 2010, Dkt. No. 14.

Intervenor's Memorandum in Support of Its Cross Motion for Judgment on the Administrative Record for Region 1P, and Opposition to Protester's Application for a Temporary Restraining Order and a Preliminary Injunction for Region 1P (BLB's Motion or BLB's Mot.), Dkt. No. 38, were all filed on July 19, 2010.  Intervenor Ofori & Associates, P.C.'s Opposition and Cross-Motion for Judgment on the Administrative Record (Ofori's Motion or Ofori's Mot.), Dkt. No. 40, was filed on July 20, 2010.

Plaintiff's Consolidated Reply and Response (plaintiff's Reply or Pl.'s Reply), Dkt. No. 44, was filed on July 23, 2010.  Defendant-Intervenor BLB Resources' Reply to HomeSource's Consolidated Reply and Response to Defendant's and Intervenor's Cross Motions for Judgment on the Administrative Record for Region 1P (BLB's Reply), Dkt. No. 46; Defendant's Reply to Plaintiff's Consolidated Reply and Response (defendant's Reply or Def.'s Reply), Dkt. No. 47; Intervenor HomeTelos's Reply in Support of Its Motion for Judgment on the Administrative Record and Response to HomeSource's Consolidated Reply and Response (HomeTelos's Reply), Dkt. No. 48; and Intervenor Ofori & Associates, P.C.'s Reply to Plaintiff's Consolidated Reply and Response (Ofori's Reply), Dkt. No. 49, were all filed on July 27, 2010.

In its Motion plaintiff seeks to enjoin the government from proceeding with the Solicitation or, in the alternative, to enjoin the government from paying for performance of any contract awarded to any offeror other than plaintiff.  Pl.'s Mot. 2.  In its Motion defendant asserts that plaintiff lacks standing to challenge the award and requests that the court deny plaintiff's Motion and plaintiff's request for an injunction and dismiss plaintiff's Complaint.  Def.'s Mot. 14-15, 32.  In its Motion BLB requests that the court grant its Motion and deny plaintiff's application for a temporary restraining order and preliminary injunction.  BLB's Mot. 1.  In its Motion HomeTelos seeks judgement on the AR and requests that the court deny plaintiff's request for injunctive and declaratory relief.  HomeTelos's Mot. 2.  In its Motion Ofori requests that the court deny plaintiff's Motion and grant Ofori's Motion and defendant's Motion for judgment on the AR. Ofori's Mot. 1.

Included as an attachment to plaintiff's Facts is a document titled Plaintiff's Memorandum in Support of Its Motion to Supplement the Record (plaintiff's Motion to Supplement or Pl.'s Mot. to Supp.), Dkt. No. 25, filed July 12, 2010.  In response defendant filed Defendant's Response in Opposition to Plaintiff's Motion to Supplement the Administrative Record (defendant's Opposition to Supplement or Def.'s Opp. to Supp.), Dkt. No. 36, filed July 19, 2010.

The court held oral argument at the National Courts Building on Tuesday, August 3, 2010 at 2:00 p.m. Eastern Daylight Time.[3]  See Order of July 7, 2010, Dkt. No. 22.

B.      The Solicitation, the Evaluation Process, and Issues in Dispute

1.      The Solicitation

The Solicitation, a firm fixed price contract that contemplated multiple awards, was issued on July 6, 2009.  AR Tab 13, at 358-60.  The Solicitation was issued in accordance with Federal Acquisition Regulation (FAR) Subpart 8.4 Federal Supply Service (FSS) Schedules.  Id.  The Solicitation sought vendors to serve as Asset Managers (AMs) to market HUD's Real-Estate Owned (REO) portfolio, which consists of properties insured by the Federal Housing Administration (FHA) that have gone into foreclosure and been conveyed to HUD.  Id. at 360, 405.  Only vendors currently holding General Services Administration (GSA) FSS Financial and Business Solution (FABS) Schedule 520 contracts were eligible to bid on the Solicitation.  Id. at 360.  An AM was to perform five key tasks:  accurately and competitively valuing properties, achieving the highest net returns on sales, minimizing property holding time, ensuring sales to create owner-occupant opportunities, with proper accounting of closing proceeds and timely delivery of the proceeds to HUD.  Id. at 409.  The Solicitation contemplated awards for each of ten geographical areas identified as 1P, 2P, 3P, 1A, 2A, 1D, 2D, 3D, 1S and 2S. Id. at 472.

Plaintiff submitted proposals for five of the ten geographical areas:  1P, 2P, 3P, 1A, and 1D.  AR Tab 65, at 3715-80 and Tab 83, at 10,439-576; see Pl.'s Mem. 3 (listing six geographical areas including 2D even though plaintiff did not submit a proposal for area 2D).  Multiple awards were made in certain geographical areas and, in total, HUD made twenty-three awards under the Solicitation including thirteen awards for areas for which plaintiff submitted proposals.  See AR Tab 52, at 1577-93 and Tab 53, at 1594 (listing twenty-three awards).  Plaintiff did not receive an award for any of the areas for which it submitted bids and, as an unsuccessful offeror, was notified of the awards on June 3, 2010.  AR Tab 52, at 1577-93.

The Solicitation directed eligible vendors to submit a technical proposal and a price proposal.  AR Tab 13, at 510.  The technical proposal had seven parts:  a Proposal

_____

[3]  The oral argument held on August 3, 2010 was recorded by the court's Electronic Digital Recording system (EDR).  The times noted in citations to the oral argument refer to the EDR record of the oral argument.

Index; an Executive Summary; the Socio-Economic Status of the offeror; a Marketing and Sales Approach including a Marketing Plan; a Management Work Plan, which was to include a Customer Service Plan, Quality Control Plan and Contingency Plan; Key Personnel Resumes; and Past Performance information.  Id. at 511.  The price proposal required Pricing Tables and supporting documentation.  Id. at 514.  Vendors were instructed to complete Pricing Tables for the base period and for each option period for all applicable Contract Line Items (CLINs).  Id.  The Solicitation stated that the government would evaluate five factors, in descending order of importance:  Factor 1, Socio-Economic Status; Factor 2, Marketing and Sales Approach; Factor 3, Management Work Plan; Factor 4, Past Performance; and Factor 5, Price.  Id. at 516.

> 2.    The Evaluation Process

HUD established an evaluation team responsible for making the award decisions. AR Tab 10, at 307-09.  The evaluation team comprised a Source Selection Official (SSO) and a five-member Technical Evaluation Team (TET).  Id. at 308.  The TET considered the offeror's price proposal and all four technical factors--Socio-Economic Status, Marketing and Sales Approach, Management Work Plan and Past Performance--and rated each offeror based on a qualitative rating scheme.  Id. at 310-12.  The Marketing and Sales Approach, Management Work Plan and Past Performance were each rated as Excellent, Very Good, Good, Fair or Unsatisfactory.[4]  Id. at 311.  In order to arrive at the

---

[4] The Department of Housing and Urban Development (HUD) gave general descriptions of the five rating categories applicable to the technical factors other than Socio-Economic Status as follows:

> Excellent:  The factor clearly meets and consistently exceeds the Government's stated requirements in all areas.  The information provided suggests a very low risk of less than satisfactory performance on the part of the Vendor.
> Very Good:  The factor meets the Government's stated requirements in all areas, and in some areas the Vendor exceeds the Government's stated requirements. The information provided suggests a low risk of less than satisfactory performance on the part of the Vendor.
> Good:  The factor meets the Government's stated requirements in all areas.  The information provided suggests a moderate risk of less than satisfactory performance on the part of the Vendor.
> Fair:  The factor barely meets the Government's stated requirements.  The information provided suggests a substantial risk of less than satisfactory performance on the part of the Vendor.
> Unsatisfactory:  The factor fails to meet one or more of the Government's stated requirements.  The information provided suggests a very substantial risk of less

rating, the TET weighed each vendor's strengths, weaknesses, significant weaknesses and deficiencies.[5]  Id. at 310-11.  Once the TET completed its evaluation of the offers, the SSO was to "independently consider the evaluation factors and recommendation(s) from the respective [TET]."  AR Tab 77, at 9890.

---

than satisfactory [performance] on [the] part of the Vendor[.]

Administrative Record (AR) Tab 10, at 311.  Socio-Economic Status was evaluated as follows:

> For 90% to 100% of the work being performed by small businesses, veteran-owned small businesses, service-disabled veteran-owned small businesses, HUB Zone small businesses, disadvantaged businesses, women-owned or 8a small businesses, the offeror will receive a rating of Excellent.  For 70% to 89% of the work being performed by small businesses, veteran-owned small businesses, service-disabled veteran-owned small businesses, HUB Zone small businesses, disadvantaged businesses, women-owned or 8a small businesses, the offeror will receive a rating of Very Good.  For 51% to 69% of the work being performed by small businesses, veteran-owned small businesses, service-disabled veteran-owned small businesses, HUB Zone small businesses, disadvantaged businesses, women-owned or 8a small businesses, the offeror will receive a rating of Good.  For 50% or less of the work being performed by small businesses, veteran-owned small businesses, service-disabled veteran-owned small businesses, HUB Zone small businesses, disadvantaged businesses, women-owned or 8a small businesses, the offeror will receive a rating of Fair.

Id. at 312-13.

[5] In order to ensure consistency, Technical Evaluation Team (TET) members were instructed to use the following definitions for evaluation purposes:

> Strength - Capability, expertise, or knowledge which greatly increases the likelihood of the Vendor's successful performance under the Task Order.
> Weakness - Shortage of capability, expertise, or knowledge which may result in a Vendor's inability to fully perform the requirements under the Task Order.
> Significant Weakness - Shortage of capability, expertise, or knowledge which greatly decreases the likelihood of the Vendor's successful performance under the Task Order.
> Deficiency - Vendor's inadequacy or lack of capability, expertise, and knowledge which will result in the Vendor not performing the requirements under the Task Order.

Id. at 311.

On March 4, 2010, the TET issued its initial evaluation of all offerors' proposals. AR Tab 56, at 1873-2387. Plaintiff's initial proposal earned the following technical ratings: Factor 1, Socio-Economic Status, Excellent; Factor 2, Marketing and Sales Approach, Fair; Factor 3, Management Work Plan, Unsatisfactory; Factor 4, Past Performance, Fair. Id. at 2044-66. On April 22, 2010 the Contracting Officer (CO) sent an e-mail to certain prospective offerors, including plaintiff, alerting them that their proposals had "significant weaknesses, deficiencies, [or] pricing issues" and that they would have the opportunity to revise their proposals. AR Tab 36, at 994. On April 23, 2010 the CO sent letters to several prospective vendors, including plaintiff, detailing problems with the vendors' proposals and giving the vendors an opportunity to revise their proposals. AR Tab 38, at 1005-59 (telling offerors that discussions were necessary to complete the evaluation). Plaintiff submitted a revised proposal. AR Tab 83, at 10,439-576. Plaintiff's revised proposal earned the following technical ratings: Factor 1, Socio-Economic Status, Excellent; Factor 2, Marketing and Sales Approach, Unsatisfactory; Factor 3, Management Work Plan, Unsatisfactory; Factor 4, Past Performance, Fair.[6] AR Tab 55, at 1696-1711. Notably, plaintiff had earned a rating of Fair for its Marketing and Sales approach in its initial proposal, but received a rating of Unsatisfactory for its Marketing and Sales approach in its revised proposal. Compare AR Tab 56, at 2044 (initial proposal) with AR Tab 55, at 1701 (revised proposal). Overall, plaintiff's revised proposal was determined to be technically unacceptable. See AR Tab 54, at 1597-1605.

The TET wrote up detailed reports about every vendor's initial proposal, and wrote additional detailed reports about every revised proposal that was timely received. See AR Tabs 55-56, at 1618-2387. In their entirety, the reports run to more than 650 pages. Id. On May 21, 2010, after completing a detailed analysis of all offerors, the TET summarized its findings in its source selection recommendation, which it sent to the SSO. AR Tab 54, at 1596-1617. The SSO sent a memorandum to the CO stating:

> I have reviewed the [TET's] documented comparative assessment of all timely proposals received under the [Solicitation] and the underlying TET report. I have made an independent decision based upon the information presented to me. . . . My decisions are based upon the evaluation of the proposals in accordance with the evaluation criteria as listed in the [Request for Proposals].

---

[6] Socio-Economic Status (Factor 1) and Past Performance (Factor 4) did not have any significant weaknesses or deficiencies and therefore were not addressed in plaintiff's revised proposal. See AR Tab 55, at 1701-1872.

AR Tab 53, at 1594.

       3.      Issues in Dispute

       a.      Amendment 7:  Past Performance Ratings

Plaintiff's briefing raised an issue regarding the effect of Amendment 7 concerning the rating of Past Performance.  Pl.'s Mem. 12-13.  Past Performance ratings were based on three components:  relevancy, quality and sufficiency of the vendor's performance of prior contracts.  AR Tab 10, at 315.  The Past Performance rating "encompass[ed] the totality of the information provided, including completeness, relevancy, and the depth, breadth, and quality of the relevant past performance for the proposed prime contractor and proposed subcontractor/team members."  Id. at 316.  On July 6, 2009, HUD issued Amendment 7 to clarify the rating of Past Performance.  AR Tab 20, at 661-62.  Amendment 7 stated:

> The Evaluation Criteria set forth in Attachment C, Factor 4, Past Performance is amended to include the following language:  "Quotes that do not meet the minimum number of required projects will not be rated favorably or unfavorably, but will be rated as neutral."

Id. at 662.  Under the terms of the Solicitation, Past Performance is limited "only [to] references performed within the three years immediately prior to submission of the proposal."  AR Tab 13, at 516, 519-20.  HUD was to use discretion and "assess the quality of only the past performance that has any relevancy . . . [and] the sufficiency of the number of relevant records submitted."  Id. at 520.  Amendment 7 therefore clarified that if a vendor submitted Past Performance information and HUD determined that the vendor's Past Performance was insufficient with respect to relevancy, quality or sufficiency, that vendor would be rated Neutral with respect to Factor 4, Past Performance.  See AR Tab 20, at 662.

       b.      Past Performance Evaluation of Ofori

Plaintiff's protest included a criticism of defendant's consideration of the information in Ofori's Responsibility Determination.  Pl.'s Mem. 13.  The government had the discretion to consider relevant information from any source in rating the Past Performance of offerors.  AR Tab 13, at 520.  The government conducted a Responsibility Determination to ascertain whether certain offerors, including Ofori, were responsible contractors based on Past Performance.  AR Tabs 40-44.  In Ofori's Responsibility Determination, [***].  Ultimately, however, the Responsibility

Determination concluded that Ofori was a responsible contractor and recommended awarding the contract to Ofori. Id. at 1302. Plaintiff asserts that, because the Solicitation permitted the government to consider any Past Performance it found relevant, AR Tab 13, at 520, once the government decided to conduct a Responsibility Determination of Ofori, the government was required to consider the results in making its Past Performance determination. Pl.'s Mem. 13. [***].

Regarding its Responsibility Determination, Ofori submitted three Past Performance references, [***]. HUD evaluators were directed by the Solicitation to use discretion, and to consider Past Performance information only if the evaluators determined that the information was relevant. See AR Tab 13, at 520. [***]. The Responsibility Determination concluded that Ofori was "a responsible contractor," and suggested awarding contracts to Ofori under the Solicitation. Id. at 1302. [***].

    c.    Technical Evaluation of HomeSource

HomeSource asserts that the record is "absolutely devoid of any such reasoning or discussion of the strengths or weaknesses of the [p]laintiff's proposal," and that a review of the AR "provides no information concerning the basis for HUD's evaluation of HomeSource's proposal." Pl.'s Mem. 24. HomeSource asserts that "the only statement concerning HomeSource's proposal besides its final evaluation scores is that HomeSource's proposal was supposedly 'technically unacceptable.'" Pl.'s Mem. 10, 23. Plaintiff asserts that the government's source selection recommendation "states nothing concerning the strengths and weaknesses of HomeSource's proposal, either its initial proposal or the revised proposal." Pl.'s Mem. 22-23 (citing AR Tab 54). Plaintiff contends that, because the technical evaluation lacks anything but summary scores, "with no basis for the [c]ourt to understand what gave rise to those scores," the evaluation is "fatally deficient." Pl.'s Mem. 24.

The government asserts that the TET thoroughly discussed and documented the strengths and weaknesses of each vendor. Def.'s Mot. 26. In support of its position, the government directs the court to portions of the AR containing records of TET's review of the strengths and weaknesses of both plaintiff's initial proposal and its revised proposal. See AR Tab 55, at 1696-1711 (detailing strengths and weaknesses of plaintiff's revised proposal) and Tab 56, at 2044-66 (detailing strengths and weaknesses of plaintiff's initial proposal). The SSO stated in her recommendation memorandum to the CO that she had reviewed not only TET's summary report but also the underlying evaluations of the initial and revised proposals and had made an independent decision based on all of the information available. See AR Tab 53, at 1594.

10

The AR contains extensive discussions of the strengths and weaknesses of plaintiff's initial proposal.  AR Tab 56, at 2044-66.  In particular, the TET prepared a review of the strengths, weaknesses and deficiencies of plaintiff's initial proposal that extends over twenty-three pages.  Id.  For its initial proposal, plaintiff earned a rating of Excellent in the first category, Socio-Economic Status.  Id. at 2044.  For its initial proposal, plaintiff earned a rating of Fair in the second category, Marketing Sales Approach.  Id.  The TET's evaluation of plaintiff's Marketing Sales Approach was broken down into six subcategories.  Id. at 2044-54.  In three of the subcategories, Approach to Selling, Advertising/Marketing Approaches and Representing HUD, the TET noted and detailed specific "significant weaknesses" that it found with plaintiff's proposal.  Id. at 2049, 2051, 2053-54.  For its initial proposal plaintiff earned a rating of Unsatisfactory for the third category, Management Work Plan.  Id. at 2054.  The TET's evaluation of plaintiff's Management Work Plan was broken down into four subcategories.  Id. at 2054-62.  In three of the subcategories, Management Work Plan, Customer Service Component and Quality Control Plan, the government noted and detailed specific deficiencies and significant weaknesses in plaintiff's proposal.  Id. at 2056, 2057, 2060-61.  For its initial proposal, plaintiff earned a rating of Fair in the fourth category, Past Performance.  Id. at 2062.  Plaintiff submitted one relevant Past Performance record, and the TET noted that "[t]he information provided suggests a substantial risk of less than satisfactory performance on the part of [HomeSource]."  Id. at 2063.  For its initial proposal, plaintiff earned a rating of Unsatisfactory in the fifth category, Price.  AR Tab 54, at 1597.  The government determined that HomeSource's proposed prices in areas 2P, 3P and 1P were "not a good value to the government."  AR Tab 56, at 2064-65.  Because HomeSource did not complete the portions of its proposal addressing pricing in areas 1A or 1D, the TET determined that the proposed prices were not reasonable.[7]  Id. at 2065-66.

Plaintiff's initial proposal was determined to have significant weaknesses or deficiencies in six subcategories and in its pricing.  See id. at 2049, 2051, 2053-54, 2056, 2057, 2060-61, 2065-66.  As a result of its significant weaknesses, deficiencies and pricing issues, HomeSource received a discussion letter from HUD and submitted its revised proposal, with the intent, the court assumes, of addressing the concerns the TET had identified in plaintiff's initial proposal.  See AR Tab 38, at 1023-36 (discussion letter) and Tab 83, at 10,439-576 (revised proposal).

---

[7] Because plaintiff did not submit a proposal for area 2D, there is no information regarding plaintiff's price for area 2D in the TET's review of plaintiff's initial proposal.  See AR Tab 56, at 2064-66.

The TET evaluated plaintiff's revised proposal and determined that it was technically unacceptable. AR Tab 54, at 1597-1605. Although plaintiff originally earned a rating of Fair in its initial proposal for Factor 2, Marketing and Sales Approach, AR Tab 56, at 2044, it was downgraded to a rating of Unsatisfactory in its revised proposal, AR Tab 55, at 1701. The TET determined that plaintiff's "statements [in its revised proposal] are inconsistent with the contract requirements" and reduced plaintiff's Marketing and Sales Approach rating. Id. at 1699. Plaintiff's revised proposal also failed to correct the defects of its pricing proposal. See id. at 1710-11. The TET determined that the revised prices for Areas 1P and 2P were "unreasonable." Id. at 1710. In addition, the TET noted that several pieces of information were missing from plaintiff's price information for Areas 2P, 3P, 1P and 1A. Id. at 1710-11. The TET noted that, even though plaintiff's pricing information was incomplete, nevertheless "[s]taffing costs overall appear to be high," the hourly rates for certain positions were "excessive and costly," and overall the proposal "do[es] not appear reasonable for th[e] task." Id.

On May 21, 2010, Elissa Saunders, the chair of the TET, submitted a Source Section Recommendation to Joy Hadley, the SSO. AR Tab 54, at 1596-1617. The summary included the ratings that HomeSource earned in each of the five categories for its revised proposal: for Socio-Economic Factor, a rating of Excellent; for Marketing/Sales Approach, a rating of Unsatisfactory; for Management Work Plan, a rating of Unsatisfactory; for Past Performance, a rating of Fair; as an Overall Technical Rating, a rating of Unsatisfactory. Id. at 1597. The memorandum included twenty pages of summarized findings, but, because the TET found plaintiff's revised proposal to be "technically unacceptable," plaintiff's proposal was not discussed in the findings delivered to the SSO. See id. at 1598-1617.

d.      Schedule 520 Services

Plaintiff contends that, because intervenor Ofori proposed labor categories that were not listed on its GSA FSS FABS Schedule 520 contract, HUD's decision to award task orders to Ofori violated FAR Part 8 procedures. Pl.'s Mem. 16, 20-21. The government contends that it did not err in awarding contracts to Ofori that because Ofori derived its proposed staffing from labor categories on its Schedule 520, it was qualified to provide AM services based on its Schedule 520 contract. Def.'s Mot. 18-19. Similarly, Ofori contends that the government did not err in awarding it certain contracts because its proposed job descriptions were derived from its Schedule 520 labor categories and were therefore within the scope of its Schedule 520 contract. Ofori's Mot. 19-20.

The first paragraph of the Solicitation stated that "[p]rospective vendors must be GSA Schedule contract holders on Schedule 520 at the time of proposal submissions." AR Tab 13, at 360. Vendors were also instructed that, if they intended to use

subcontractors, those subcontractors could provide only products and services on the contractor's GSA Schedule 520 contract. Id. at 398. Although the Solicitation did not require offerors to identify specific job positions, offerors were instructed to identify key personnel and information about the roles and responsibilities of qualified staff in their Management Work Plans. Id. at 512. Specifically, the Management Work Plan required that offerors "describe the lines of authority and roles and responsibilities of all corporate entities." Id. at 513.

Ofori's final Management Work Plan included seventeen job positions in its Management Work Plan, none of which was included in its Schedule 520 contract.[8] AR Tab 61, at 3150; see Tab 80, at 10,064-66. Ofori's Schedule 520 contract listed the following five labor categories:  Partner, Audit Manager, Supervisor, Staff Accountant and Data Entry Clerk. Ofori's Mot. 10-12. Ofori provided a spreadsheet that mapped the job positions it included in its Management Work Plan to the labor categories on its Schedule 520 contract. AR Tab 61, at 3150. Ofori also listed the Schedule 520 contract rates and the discount from those rates that its proposal offered. Id. Plaintiff proposed nineteen different job positions in its final Management Work Plan, AR Tab 83, at 10,460, none of which was included in its Schedule 520 contract.[9] See Ofori's Mot. 23.

---

[8] The seventeen positions that Ofori included in its revised proposal were:  Project Manager; Alternate Project Manager; Marketing Manager; Marketing Specialists; Closing Manager; Closing Specialists; Staff Appraiser; QC Manager; Title Review; QC Inspector; Customer Service; IT; Files Manager; Record Specialists; Files Imaging; Accounting; and Human Resource. AR Tab 61, at 3150. Ofori's FSS contract listed the following five labor categories:  Partner, Audit Manager, Supervisor, Staff Accountant and Data Entry Clerk. Intervenor Ofori & Associates, P.C.'s Opposition and Cross-Motion for Judgment on the Administrative Record (Ofori's Motion or Ofori's Mot.), Dkt. No. 40, at 10-12. Ofori provided the following mapping in its revised proposal:  Partner was the Schedule 520 Contract equivalent of Project Manager and Alternate Project Manager; Supervisor was the Schedule 520 Contract equivalent of Marketing Manager, Closing Manager, QC Manager, Title Review, QC Inspector, IT, Files Manager and Human Resource; Staff Accountant was the Schedule 520 Contract equivalent of Marketing Specialists, Closing Specialists and Accounting; Audit Manager was the Schedule 520 Contract equivalent of Staff Appraiser; and Data Entry Clerk was the Schedule equivalent of Customer Service, Records Specialists and Files Imaging. AR Tab 61, at 3150.

[9] The twenty job positions plaintiff listed in its proposal were:  Project Manager/Principal; Managing Partner; Marketing Director; Assistant Marketing Manager; Financial Analyst - Senior; Financial Analyst - Junior; Customer Service Manager; Subject Matter Expert; NAID Administrator; Listing/Bid Administrator; Closing Manager; Post Closing Clerk; REO Specialist, Senior; REO Specialist, Junior; Quality Control Assistant; Office Manager/Contract Manager; Customer Service Manager; Administrative Assistant; Contract Consultant; and Quality Control Expert. AR Tab 83, at 10,460. Plaintiff's Schedule 520 contract listed the following five

13

Unlike Ofori, HomeSource did not explain how its proposed job positions related to the positions listed on its FSS contract, nor did HomeSource provide the Schedule 520 contact rates for the job positions or indicate any discounts it was offering from its Schedule 520 contract rates.  See AR Tab 83, at 10,460.

II.     Legal Standards

    A.     Supplementation of the Administrative Record

In bid protest cases, "'the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court.'"  Axiom Res. Mgmt., Inc. v. United States (Axiom), 564 F.3d 1374, 1379 (Fed. Cir. 2009) (quoting Camp v. Pitts, 411 U.S. 138, 142 (1973)).  The reviewing court must "'apply the appropriate [Administrative Procedure Act (APA)] standard of review to the agency decision based on the record the agency presents to the reviewing court.'"  Id. (emphasis added) (quoting Fla. Power & Light Co. v. Lorion, 470 U.S. 729, 743-44 (1985)) (internal citations omitted).  Supplementation of the record should only be permitted if such omission would "preclude[] effective judicial review."  Id.; see Murakami v. United States, 46 Fed. Cl. 731, 735 (2000), aff'd, 398 F.3d 1342 (Fed. Cir. 2005) (finding that supplementation to the record "should be triggered only where the omission of extra-record evidence precludes effective judicial review").

    B.     Bid Protest Standard of Review

The Tucker Act, as amended by the Administrative Dispute Resolution Act (ADRA), 28 U.S.C. § 1491(b) (2006), confers jurisdiction on this court

> to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement.

28 U.S.C. § 1491(b)(1).  The court reviews a bid protest action under the standards set out in the Administrative Procedure Act (APA), 5 U.S.C. § 706 (2006).  28 U.S.C. § 1491(b)(4); NVT Techs., Inc. v. United States, 370 F.3d 1153, 1159 (Fed. Cir. 2004). The APA provides that an agency's decision is to be set aside if it is "arbitrary,

---

services:  Property Management Fee, Vacant Lot Management Fee, Marketing Fee, Held Off Market Properties Fee and Custodial Fee.  Ofori Mot. 23.

capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A); see also Bannum, Inc. v. United States (Bannum), 404 F.3d 1346, 1351 (Fed. Cir. 2005); Galen Med. Assocs., Inc. v. United States (Galen), 369 F.3d 1324, 1329 (Fed. Cir. 2004); Impresa Construzioni Geom. Domenico Garufi v. United States (Impresa), 238 F.3d 1324, 1332 (Fed. Cir. 2001); Advanced Data Concepts, Inc. v. United States (Advanced Data Concepts), 216 F.3d 1054, 1057 (Fed. Cir. 2000).

Under the arbitrary or capricious standard of review, an agency's decision must be sustained if it has a rational basis.  Motor Vehicle Mfrs. Ass'n of the United States, Inc. v. State Farm Mut. Auto Ins. Co. (State Farm), 463 U.S. 29, 43 (1983).  "The arbitrary and capricious standard applicable here is highly deferential.  This standard requires a reviewing court to sustain an agency action evincing rational reasoning and consideration of relevant factors."  Advanced Data Concepts, 216 F.3d at 1058 (citing Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc., 419 U.S. 281, 285 (1974)).  In particular, the reviewing court may not substitute its judgment for that of the agency. Citizens to Preserve Overton Park, Inc. v. Volpe (Overton Park), 401 U.S. 402, 416 (1971), abrogated in part by Califano v. Sanders, 430 U.S. 99, 105 (1977) (abrogating Overton Park by recognizing that the APA is an independent grant of subject-matter jurisdiction).

Under the APA standard of review, as applied in Scanwell Labs., Inc. v. Shaffer, 424 F.2d 859 (D.C. Cir. 1970), and now under the ADRA, "a bid award may be set aside if either:  (1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure."  Impresa, 238 F.3d at 1332.  Challenges to decisions on the basis of a violation of a regulation or procedure "must show a clear and prejudicial violation of applicable statutes or regulations."  Impresa, 238 F.3d at 1333 (internal quotation and citation omitted).

In order to prevail in a bid protest, a "protestor must show not only a significant error in the procurement process, but also that the error prejudiced [the protestor]."  Data Gen. Corp. v. Johnson, 78 F.3d 1556, 1562 (Fed. Cir. 1996); see also Alfa Laval Separation, Inc. v. United States (Alfa Laval), 175 F.3d 1365, 1367 (Fed. Cir. 1999).  If the court finds that there is no error, there is no prejudice and the government's decisions must be left undisturbed.  Alfa Laval, 175 F.3d at 1367 (requiring that a protestor establish "significant, prejudicial error" to prevail in a bid protest).  The first step is to demonstrate error; to show that the agency acted in an arbitrary and capricious manner, without a rational basis or contrary to law.  See Bannum, 404 F.3d at 1351.  The next step is to determine whether the error was prejudicial.  See id.  "[B]ecause the question of prejudice goes directly to the question of standing, the prejudice issue must be reached before addressing the merits."  Labatt Food Serv. Inc. v. United States, 577 F.3d 1375, 1378 (Fed. Cir. 2009) (quoting Info. Tech. & Applications Corp. v. United States (Info.

Tech.), 316 F.3d 1312, 1319 (Fed. Cir. 2003)).  "Non-prejudicial errors in a bid process do not automatically invalidate a procurement."  Id. at 1380.  The plaintiff must demonstrate both that an error occurred and that such error was prejudicial.  Data General Corp., 78 F.3d at 1562.  In the context of a post-award bid protest, "the plaintiff must demonstrate 'substantial prejudice' by showing that there was a 'substantial chance' it would have been awarded the contract but for the agency's error."  Weeks Marine, Inc. v. United States (Weeks Marine I), 79 Fed. Cl. 22, 35 (2007) (internal citation omitted), aff'd in relevant part, 575 F.3d 1352 (Fed. Cir. 2009) (Weeks Marine II).

C.      Standing

"Standing is a threshold jurisdictional issue, which . . . may be decided without addressing the merits of a determination."  Castle v. United States, 301 F.3d 1328, 1337 (Fed. Cir. 2002).  Before addressing the merits of a plaintiff's protest, a court must therefore determine whether a plaintiff has standing to invoke the court's jurisdiction. See Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992) ("the party invoking federal jurisdiction bears the burden of establishing [the] elements [of standing]").  The United States Court of Federal Claims (CFC) has jurisdiction "to render judgment on an action by an interested party objecting to a solicitation . . . ."  28 U.S.C. § 1491(b)(1) (emphasis added).  The threshold issue in determining whether a party has standing is whether a protester qualifies as an "interested party" under § 1491(b)(1).  See Am. Fed'n of Gov't Employees v. United States (Am. Fed'n), 258 F.3d 1294, 1302 (Fed. Cir. 2001).

An interested party includes "'actual or prospective bidders or offerors whose direct economic interest would be affected by the award of the contract or by failure to award the contract.'"  Rex Serv. Corp. v. United States (Rex), 448 F.3d 1305, 1307 (Fed. Cir. 2006) (quoting Am. Fed'n, 258 F.3d at 1298).  A protestor lacks direct economic interest if it there was no prejudice, that is, if it would not have had a substantial chance of receiving the award but for the government's alleged error.  See Bannum, 404 F.3d at 1353; Textron, Inc. v United States (Textron), 74 Fed. Cl. 277, 284 (2006).  Therefore, to establish standing a plaintiff must show both that it is an actual or prospective bidder, and that it was prejudiced by the government's decision.  See Rex, 448 F.3d at 1307; RhinoCorps Ltd. Co. v. United States, 87 Fed. Cl. 261, 271-72 (Fed. Cl. 2009).

Prejudice is therefore a necessary element of standing.  Myers Investigative & Sec. Servs., Inc. v. United States (Myers) 275 F.3d 1366, 1372 (Fed. Cir. 2002).  "The requisite showing of prejudice to establish standing is satisfied when a protestor demonstrates that, absent the alleged error, a 'substantial chance' exists that it would have received the contract award."  Textron, 74 Fed. Cl. at 283, 327-29 (discussing the difference between the prejudice requirement for standing and the prejudice requirement

16

on the merits); see Bannum, 404 F.3d at 1353; Myers, 275 F.3d at 1370 (stating that, as to standing "the substantial chance rule continues to apply").

    D.    Motions for Judgment on the Administrative Record

    Rule 52.1 of the Rules of the Court of Federal Claims (RCFC) provides for judgment on the administrative record "[w]hen proceedings before an agency are relevant to a decision in a case" before the court.  RCFC 52.1(a).  RCFC 52.1 does not address the standards and criteria to be applied in cases decided pursuant to RCFC 52.1 because "[t]he standards and criteria governing the court's review of agency decisions vary depending upon the specific law to be applied in particular cases."  RCFC 52.1 rules committee notes (2006).  Accordingly, the standards of review and burdens of proof and persuasion are set by the terms of the applicable substantive law, including, in this case, statutory and case law discussed above in Part II.B.

    A court reviewing a best value procurement agency action must be highly deferential, and the agency that made the determination in question is presumed to have acted in a reasonable and rational manner.  Advanced Data Concepts, 216 F.3d at 1058; Fort Carson Support Servs. v. United States (Fort Carson), 71 Fed. Cl. 571, 586 (2006).  A plaintiff must rebut the presumption of a rational basis in order to upset the agency's findings.  L-3 Commc'ns EOTech, Inc. v. United States, (L-3 Commc'ns), 87 Fed. Cl. 656, 664 (2009); see Advanced Data Concepts, 216 F.3d at 1058 ("[The arbitrary and capricious] standard requires a reviewing court to sustain an agency action evincing rational reasoning and consideration of relevant factors."(internal quotation marks omitted)).  In determining whether an agency acted rationally, the court is particularly deferential to the agency's technical evaluation.  L-3 Commc'ns, 87 Fed. Cl. at 664.  "In particular, the evaluation of proposals for their technical excellence or quality is a process that often requires the special expertise of procurement officials, and thus reviewing courts give the greatest deference possible to these determinations."  Fort Carson, 71 Fed. Cl. at 586 (citations omitted).

    "Contracting officers are not obligated by the APA to provide written explanations for their actions."  Impresa, 238 F.3d at 1337.  Moreover, agency actions are entitled to a presumption of "regularity."  Id. at 1338.  There is a "strong presumption that government officials act correctly, honestly, and in good faith when considering bids."  Savantage Fin. Servs., Inc. v. United States, 86 Fed. Cl. 700, 703-04 (2009).

    The court will not second-guess the ratings given by procurement officials that involve discretionary determinations.  E.W. Bliss Co. v. United States, 77 F.3d 445, 449 (Fed. Cir. 1996).  The question for the court is not whether the agency is correct or whether the court would have reached the same conclusion as the agency did, but whether

there was a reasonable basis for the agency's actions.  Honeywell, Inc. v. United States, 870 F.2d 644, 648 (Fed. Cir. 1989) ("'If the court finds a reasonable basis for the agency's action, the court should stay its hand even though it might, as an original proposition, have reached a different conclusion as to the proper administration and application of the procurement regulations.'" (quoting M. Steinthal & Co. v. Seamans, 455 F.2d 1289, 1301 (D.C. Cir. 1971))).

III.   Discussion

A.   Supplementation of the Administrative Record

Plaintiff "seeks to supplement the record here with evidence from Ofori's website demonstrating that the presumptive awardee does not have a schedule contract for the products or services required by the Solicitation."  Pl.'s Mot. to Supp. 8. Supplementation of the AR is appropriate only where failure to supplement the record would "preclude[] effective judicial review."  Axiom, 564 F.3d at 1379 (internal citation and quotation marks omitted).  Before the court is an extensive AR, including information regarding the terms of the Solicitation, each offeror's initial and revised proposals, and numerous comments and findings made by TET and the SSO.  See AR passim.  Further, as discussed in greater detail below, see infra Part III.C.4, the AR included a mapping chart provided by Ofori, explaining how the services offered on its FSS Schedule 520 relate to the work required by the Solicitation.  See AR Tab 61, at 3150.  Because the court finds that it has sufficient information before it to carry out an "effective judicial review," see Axiom, 564 F.3d at 1379, plaintiff's Motion to Supplement is DENIED.

B.   Standing of HomeSource to Challenge Award

Defendant asserts that "HomeSource does not have standing to challenge HUD's award decisions because plaintiff did not have a substantial chance for award."  Def.'s Mot. 15.  Defendant contends that, because HUD determined that plaintiff's proposal was technically unacceptable and, because plaintiff does not challenge this underlying evaluation of its proposal, plaintiff cannot show that it has a substantial chance of being awarded the contract "but for the agency's error."  Id.; see Bannum, 404 F.3d at 1358; Weeks Marine I, 79 Fed. Cl. at 35.  To have standing, a plaintiff must demonstrate that it was prejudiced by the government's decision.  See Rex, 448 F.3d at 1307 (finding that a protestor lacks direct economic interest, and therefore lacks standing, if the protestor was not prejudiced by the government's decision).  To be prejudiced, a plaintiff must demonstrate that it would have had a substantial chance of receiving an award but for the government's error.  See Rex, 448 F.3d at 1308; Textron, 74 Fed. Cl. at 283, 327-29.  For the foregoing and the following reasons, plaintiff HomeSource was not prejudiced by the

government's decision because it did not have a substantial chance of receiving the award.

Plaintiff's offer was non-responsive to the Solicitation, e.g., AR Tab 55, at 1703, and therefore would have been ineligible for the award even if plaintiff prevailed on the merits.  Plaintiff received the following TET consensus ratings:  Socio-Economic Status, Excellent; Marketing and Sales Approach, Unsatisfactory; Management Work Plan, Unsatisfactory; and Past Performance, Fair.  AR Tab 54, at 1596.  Plaintiff had an overall technical rating of Unsatisfactory, id. at 1597, and failed to meet the Solicitation requirements, AR Tab 55, at 1697, 1703, 1706, 1710-11.

The TET was concerned that plaintiff's initial method for assigning properties to a listing broker permitted a 24-hour delay that might negatively impact HUD's goals.  AR Tab 55, at 1696-97.  Although plaintiff responded to this concern, the TET determined that plaintiff's revised plan "may still result in delays in performance," and remained a significant weakness.  Id. at 1697.  The TET informed plaintiff that, because plaintiff failed to state that it would represent HUD in its Marketing Work Plan, the TET determined this to be a significant weakness in plaintiff's proposal.  See id. at 1701.  In its revised proposal, plaintiff still "d[id] not explicitly state that it will represent HUD in its marketing plan."  Id.  The TET determined that plaintiff's revisions did not correct the problem that the TET had identified in plaintiff's initial proposal regarding plaintiff's representation of HUD.  See id.  Similarly, plaintiff "failed to submit a work flow chart detailing process and steps" in both its initial and its revised proposal, notwithstanding the TET's request that it do so.  Id. at 1703.  Plaintiff also failed to "ensure an objective review" of its operations in its revised proposal notwithstanding the TET's request that plaintiff revise its quality control plan.  Id. at 1706.

The TET also determined that plaintiff's price for areas 1P and 2P were "unreasonable," id. at 1710, and that plaintiff "did not completely price" areas 1A and 1D, id. at 1711.  In addition to the unreasonable and incomplete pricing, the TET determined that several other aspects of plaintiff's revised proposal made it technically unacceptable.

> [Plaintiff's] technical proposal did not include the required position of Project Manager.
>
> The labor mix does not match the brief description in the [Management Work Plan], nor does it appear to allocate enough resources to this contract area.
>
> . . . .

. . . .   The technical proposal did not sufficiently describe the duties or roles of [certain] management level positions.

The vendor lists two Financial Analysts at hourly rates . . . [that] appear[] excessive and costly.

The proposal contains a very high mix of managers to staff.  Staffing costs overall appear to be high.

The pricing proposal did not indicate the number of positions, and the total hours of participation.

Id. at 1710.

There were seven offerors who received an award in one or more geographic area for which plaintiff submitted a proposal:  BLB, Cityside/HHN, HomeTelos, Matt Martin, Ofori and Pemco.  AR Tab 53, at 1594.  All of these offerors earned an overall technical rating of Good or Very Good.  AR Tab 54, at 1596-97.  HomeSource, in contrast, earned an overall technical rating of Unsatisfactory and the TET determined that its proposal was technically unacceptable.  Id. at 1597-1609.  The TET submitted proposed consensus ratings along with twenty pages of analysis regarding its proposed selections.  Id. at 1596-1617.  The record makes clear that HUD found HomeSource's proposal to be technically unacceptable, id. at 1597, and its pricing to be unreasonable and otherwise deficient, AR Tab 55, at 1710-11.  HomeSource does not challenge HUD's underlying evaluation findings in any way.  See Pl.'s Mot. passim.

Plaintiff seeks to enjoin the award in area 2D.  See Pl.'s Mem. 1.  Because plaintiff did not submit a proposal for 2D in either its initial or revised proposal, see AR Tabs 65, 83, it is not an interested party and it LACKS STANDING with regards to area 2D, see Rex, 448 F.3d at 1307 (requiring that a protestor be an actual or prospective bidder in order to establish standing).

Also supporting the court's determining that plaintiff did not have a substantial chance of receiving an award is the fact that for each of the contracts that plaintiff sought, there were several technically acceptable offerors with better ratings than HomeSource that HUD could have chosen for award.[10]  AR Tab 54, at 1598-1605.  Even if plaintiff's

---

[10] The TET compiled the following list of vendors and their corresponding Overall Technical Ratings:  Answer Title, [***]; BestAssets Inc., [***]; BLB Resouces Inc., Very Good; Cityside-HHM CTA, Good; CWS Marketing Group Inc., [***]; DEVAL LLC, [***]; Haynes Inc., [***]; HMBI, [***]; HomeSource Real Estate, Unsatisfactory; HomeTelos LP, Good;

protest grounds were sustained, there were eight vendors that did not receive any award and had higher technical ratings than plaintiff.  Any of these eight vendors would have provided a better choice to the government.  See id. 1596-1609.  Therefore, even if plaintiff were to succeed in its protest on the merits, there is not a substantial chance it would be awarded the contract.  See Weeks Marine I, 79 Fed. Cl. at 35.  Plaintiff cannot demonstrate that, but for the government's alleged error, it had a substantial chance of being awarded the contract.  Plaintiff is not an interested party.  See Bannum, 404 F.3d 1353.  Because plaintiff cannot demonstrate that it is an interested party, the court finds that plaintiff LACKS STANDING.  However, for reasons of judicial economy and efficiency, in the event that a reviewing court should disagree with the foregoing finding of lack of standing, the court also addresses the merits of the case.  See infra Part III.C.

C.      Whether Plaintiff's Protest Has Merit

Plaintiff's arguments on the merits are that HUD failed to evaluate the past performance of offerors properly, in particular, that HUD interpreted Amendment 7 of the Solicitation to apply to Past Performance and not to the entire technical proposal and that HUD incorrectly evaluated Ofori's Past Performance as neutral, Pl.'s Mem. 12-13; that the technical evaluation of HomeSource was "absolutely devoid of any such reasoning or discussion," such that the technical ratings were "fatally deficient," id. at 24; and that HUD failed to follow evaluation criteria in the Solicitation regarding FSS contracts and illegally awarded a contract to Ofori for non-FSS services.  Id. at 15-16.

1.      Amendment 7:  Past Performance Ratings[11]

Amendment 7 stated that "Factor 4, Past Performance is amended to include the following language:  'Quotes that do not meet the minimum number of required projects will not be rated favorably or unfavorably, but will be rated as neutral.'"  AR Tab 20, at

---

Hooks Van Holm Inc., [***]; Innotion Enterprises Inc., [***]; Liberty Systems Management Inc., [***]; Matt Martin, Good; NIS Solutions, [***]; Ofori and Associates PC, Good; Pemco Ltd., Good; Prescient Inc., [***]; Pyramid Real Estate Services LLC, [***]; Realty Marketing Associates Inc., [***]; Veneta Ford Group Inc., [***]; Wallace Asset Management, [***]; and Washington Products and Services, Inc., [***].  AR Tab 54, at 1596-97.  Of the twenty-four vendors, ten (including plaintiff) earned an overall technical rating of Unsatisfactory, six earned an overall technical rating of Fair, seven earned an overall technical rating of Good and one earned an overall technical rating of Very Good.  Id.

[11] Although fully briefed, plaintiff appeared to abandon this argument during oral arguments.  See generally Oral Argument of August 3, 2010, Argument of Mr. Murdock, 2:22:09-33, and 2:22:27-33 ("I think that I have articulated the argument that I am relying on.").

662.  The amendment makes clear that this language was in reference to Attachment C, Factor 4, Past Performance.  Id.  Plaintiff asserts that, in using the word "quotes," the government must be understood to have amended the Solicitation to provide that any vendor that did not meet the minimum number of past performance projects should be rated as Neutral in every category of its proposal.  Pl.'s Mem. 12-13.  [***][12]

The government contends, correctly, that Amendment 7 relates only to Factor 4, Past Performance.  See Def.'s Mot. 21-23.  Attachment C of the Solicitation lists each of the five factors that the TET considered in making its evaluation, and Factor 4 concerns only Past Performance.  AR Tab 13, at 516.  Amendment 7 limited its scope of reference to Factor 4, Past Performance.  AR Tab 20, at 661-62 ("The Evaluation Criteria set forth in Attachment C, Factor 4, Past Performance is amended").  Further, as the government correctly observes, assigning a neutral rating to a vendor for every proposal factor because the vendor lacked the minimum number of required projects would be unreasonable and contrary to the agency's motivation for assigning a neutral rating to offerors without sufficient past performance.  See Def.'s Mot. 22 (citing FAR 15.305(a)(2)(iv) ("In the case of an offeror without a record of relevant past performance or for whom information on past performance is not available, the offeror may not be evaluated favorably or unfavorably on past performance.")).[13]

Amendment 7 of the Solicitation is subject to basic rules of contract interpretation, requiring the court to "interpret a contract as a whole and in a manner which gives reasonable meaning to all parts and avoids conflict or surplusage of its provisions."  Metro. Van & Storage, Inc. v. United States, 92 Fed. Cl. 232, 263-64 (2010) (internal quotation marks omitted).

---

[12] HomeTelos earned the following ratings:  [***].  AR Tab 54, at 1597.  HomeTelos's price [***] was considered by the TET to be reasonable.  AR Tab 55, at 1720-21.  Ofori earned the following ratings:  for Socio-Economic Factors, a rating of Excellent; for Marketing/Sales Approach, a rating of Fair; for Management Work Plan, a rating of Good; and for Past Performance, a rating of Neutral.  AR Tab 54, at 1597.  Ofori's price compared favorably with other vendors' prices and was considered by the TET to be reasonable.  AR Tab 55, at 1776-78.

[13] Past Performance is one indicator of the likelihood that the offeror will be able to perform the contract successfully.  Federal Acquisition Regulation (FAR) 15.305(a)(2)(i).  When an offeror has insufficient Past Performance to aid the government in determining the likelihood of success, the government should give the offeror a score of Neutral with regards to Past Performance.  Id. at 15.305(a)(2)(iv).  A score of Neutral is given so that an offeror without sufficient Past Performance will not be helped or hindered by the lack of Past Performance.

> [The court] follow[s] the established general rules that provisions of a
> contract must be so construed as to effectuate its spirit and purpose, that it
> must be considered as a whole and interpreted so as to harmonize and give
> meaning to all of its provisions, and that an interpretation which gives a
> reasonable meaning to all parts will be preferred to one which leaves a
> portion of it useless, inexplicable, inoperative, void, insignificant,
> meaningless, superfluous, or achieves a weird and whimsical result.

Arizona v. United States, 216 Ct. Cl. 221, 575 F.2d 855, 863 (1978).  Amendment 7 must
therefore be interpreted to give meaning to the entire Solicitation and avoid an
"inexplicable" result.  Id.  The court finds plaintiff's interpretation "inexplicable."

In its Reply, plaintiff again asserts that "Amendment 7 changed the Evaluative
Criteria by making Past Performance where a vendor had no relevant Past Performance
determinative of a neutral rating for the entire quote."  Pl.'s Reply 14.  Plaintiff cites Hunt
Building Co., Ltd. v. United States (Hunt), 61 Fed. Cl. 243, 276 (2004), for the
proposition that amendments to the solicitation must be read in the context of the
solicitation as a whole.  In Hunt, the Amendment required offerors to identify "proposed
exceptions or modifications" to the terms of the solicitation.  Id.  The Hunt court
determined that the terms of the Amendment allowed the government to consider
proposed modifications, but did not incorporate modifications into the solicitation without
further action.  Id.  In reaching its conclusion, the Hunt court focused on the text of the
Amendment which allowed offerors to identify possible proposals, but made no mention
of incorporating those amendments into the solicitation.  Id.  In this case, however, the
text of Amendment 7 makes clear that it affects only Attachment C, Factor 4, Past
Performance.  AR Tab 13, at 516.  Read in the context of the entire Solicitation,
Amendment 7 refers only to Past Performance and does not affect any rating other than
Factor 4, Past Performance.  See id.

The court agrees with Ofori that "HUD simply intended the revision to incorporate
the principle in FAR 15.305(a)(2)(iv), which states that '[i]n the case of an offeror
without a record of relevant past performance or for whom information on past
performance is not available, the offeror may not be evaluated favorable or unfavorable
on past performance.'"  Ofori's Mot. 2 (quoting FAR 15.305(a)(2)(iv)).

Amendment 7 states plainly that quotes should receive neutral ratings with respect
to Factor 4.  AR Tab 20, at 661-62.  Under the arbitrary or capricious standard of review,
an agency's decision must be sustained if it has a rational basis.  State Farm, 463 U.S. at
43.  At most, HUD's use of the term "quotes" in Amendment 7 might be reviewed as
infelicitous, but a reasonable provision that may contain an infelicitous choice of a single
word is hardly lacking in a rational basis.  The court finds that there is a rational basis for

23

the government's determination that Amendment 7 applied only to Factor 4, Past Performance.  Because HomeSource has not demonstrated that HUD's reading of Amendment 7 was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law," 5 U.S.C. § 706(2)(A), HomeSource cannot establish that it suffered any prejudicial effect.[14]  For the foregoing reasons, plaintiff's Motion with respect to Amendment 7 is DENIED and defendant's Motion with respect to Amendment 7 is GRANTED.

2.     Ofori's Past Performance Rating

Plaintiff asserts that HUD "failed to take into consideration information from other sources showing Ofori's material unfitness for award."  Pl.'s Reply 15.  Plaintiff further asserts that Ofori's "past performance was not relevant and therefore required a rating of neutral."  Id.  Plaintiff's assertion is confusing, because Ofori did in fact receive a rating of neutral for its Past Performance.  AR Tab 54, at 1697.  Plaintiff clarified at oral argument that it was plaintiff's position that Ofori should have received a rating of Fair or Unsatisfactory for its Past Performance.  Oral Argument of August 3, 2010, Argument of Mr. Murdock, 2:04:56-05:35; see id. 2:21:23-37. ("They chose to make a conclusion about those things, that was a high risk . . .  Once they choose to do that, it was arbitrary and capricious of them to disregard it.").  Plaintiff points to Ofori's Responsibility Determination which concluded that "Ofori's Past Performance indicates high risk of less than satisfactory performance under this contract."  AR Tab 43, at 1301; Oral Argument of August 3, 2010, Argument of Mr. Murdock, 2:05:11-17 ("concluding after looking at it that it demonstrated a high risk of performance on the very solicitation at issue").

As the government correctly notes, [***].  Further, and more importantly, considering all factors, Ofori was "determined to be a responsible contractor."  AR Tab 43, at 1302;  Oral Argument of August 3, 2010, Argument of Mr. Ashman, 2:44:07-18.  The Solicitation stated that HUD had discretion to determine Past Performance ratings based on "completeness, relevancy, and the depth, breadth, and quality of the relevant past performance."  AR Tab 13, at 520 (emphasis added).  [***].  For the foregoing reasons, plaintiff's Motion with respect to Ofori's Past Performance rating is DENIED and defendant's Motion with respect to Ofori's Past Performance rating is GRANTED.

---

[14] Not only does plaintiff's contention that Amendment 7 be read to apply all factors result an irrational outcome, it is also untimely.  Amendment 7 was published on October 26, 2009.  AR Tab 20, at 661.  If plaintiff viewed the provision as either irrational ambiguous, plaintiff should have brought its view to the attention of the government prior to the awarding of the contract.  See OTI America, Inc. v. United States, 68 Fed. Cl. 108, 113 (2005) (clarifying that an action that objects to the solicitation is properly brought as a pre-award protest).

3.      Technical Evaluation of HomeSource[15]

Plaintiff asserts that defendant failed to provide reasoning to support defendant's technical evaluation score of plaintiff's proposal.  Pl.'s Mem. 24.

> The record is absolutely devoid of any . . . reasoning or discussion of the strengths or weaknesses of Plaintiff's proposal.  Rather all we have is the summary scores afforded HomeSource with no basis for the Court to understand what gave rise to those scores.

Id.  Plaintiff contends that, because the government failed to weigh the strengths and weaknesses of plaintiff's proposal, stating only that it was [***], the court should find that the agency's decision lacked a rational basis.  Pl.'s Mem. 23 (citing Centech Group, Inc. v. United States, 554 F.3d 1029, 1037 (Fed. Cir. 2009)).  The government contends that the agency's determination should be upheld because HUD thoroughly discussed and documented the strengths and weaknesses of all vendors' proposals, including HomeSource's proposal.  Def.'s Mot. 26.

In its source selection recommendation, the TET lists plaintiff's scores in each of the technical categories, giving plaintiff an overall technical rating of Unsatisfactory.  AR Tab 54, at 1597.  In the twenty pages of comments and analysis that follow the consensus ratings, the TET notes that plaintiff's proposals were [***] in all six award areas for which plaintiff submitted a proposal.  Id. at 1598-1617.  A review of the AR makes it clear that the SSO made her decision based on the TET's documented comparative assessment, the underlying TET report, and her independent analysis based on all the information presented to her.

Regarding HomeSources's initial proposal, the TET compiled a twenty-three page report listing the strengths and weaknesses of plaintiff's plan.  AR Tab 56, at 2044-66.  This report weighed the strengths and weaknesses in each of the four technical categories as well as plaintiff's price.  Id.[16]  The TET determined that plaintiff's proposal was [***]

---

[15] Although fully briefed, plaintiff appeared to abandon this argument during oral arguments.  See generally Oral Argument of August 3, 2010, Argument of Mr. Murdock, 2:22:09-33 (failing to mention the TET's review of plaintiff's technical proposal and asserting "I think that I have articulated the argument that I am relying on."), and 2:22:27-33.

[16] The court quotes the following excerpts from the TET's evaluation of plaintiff's initial proposal as a sample of the analysis that TET applied in reaching its conclusion that plaintiff's proposal was [***] unacceptable.  None of the TET's specific criticisms have been addressed by plaintiff.  See Pl.'s Mot. passim; Pl.'s Reply passim.  Regarding the use of local real estate

in several categories and issued discussion questions seeking clarification and a revised proposal.  AR Tab 38, at 1023-25.  Attached to its discussion letter, the government sent plaintiff a ten-page memo outlining the significant weaknesses and deficiencies that the government had found with plaintiff's initial proposal.  Id. at 1026-35.  After reviewing HomeSource's revised proposal, the government downgraded its earlier rating for Factor 2, Marketing and Sales Approach, from a rating of [***] to a rating of [***].  Compare AR Tab 56, at 2044-54 (giving plaintiff's initial proposal a rating of [***]), with AR Tab 55, at 1696-1702 (giving plaintiff's revised proposal a rating of [***]).  The TET compiled a sixteen-page report listing the strengths and weaknesses of plaintiff's revised proposal, in which the TET noted that plaintiff's revised proposal still contained several significant weaknesses.[17]  See AR Tab 55, at 1696-1711.

HomeSource is simply incorrect in its assertion that the record is devoid of any reasoning regarding plaintiff's proposal.  The record is, however, devoid of any effort by plaintiff to address the weaknesses of its proposal identified by the TET.  The AR contains nearly forty pages of analysis devoted solely to the strengths and weaknesses of plaintiff's initial and revised proposals.  See AR Tab 55, at 1696-1711 and Tab 56, at 2044-66.  Defendant has amply demonstrated that there is a rational basis for the determination that HomeSource's proposal was [***].  See AR Tab 55, at 1696-1711 and Tab 56, at 2044-66.  Because HomeSource has not shown that HUD's technical evaluation of HomeSource's proposal was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law," 5 U.S.C. § 706(2)(A), HomeSource cannot establish that it suffered any prejudicial effect.  For the foregoing reasons plaintiff's Motion with respect to the technical evaluation of its proposal is DENIED and

---

professionals:

[***]

AR Tab 56, at 2045-46.  Regarding customer service:

[***]

Id. at 2057.

[17] The court quotes the following excerpts from the TET evaluations of plaintiff's revised proposal as a sample of the analysis that TET applied in reaching its conclusion that plaintiff's revised proposal was [***].  Regarding the use of local real estate professionals, TET noted that plaintiff's revised plan [***].  AR Tab 55, at 1697.  Regarding plaintiff's approach to sale, TET noted that plaintiff's [***].  Id. at 1699.  Regarding plaintiff's representation of HUD, TET noted that [***].  Id. at 1701.

defendant's Motion with respect to the technical evaluation of plaintiff's proposal is GRANTED.

    4.    Schedule 520 Services[18]

The FSS Schedule program provides federal agencies "with a simplified process for obtaining commercial supplies and services at prices associated with volume buying." FAR 8.402(a). Orders placed against FSS Schedule contracts are viewed as involving "full and open competition" without requiring the use of procedures contained in FAR Part 15. FAR 8.404(a). An agency that orders services against a schedule contract "shall not seek competition outside the Federal Supply Schedules." Id. In this case, HUD restricted competition to those vendors offering services on Schedule 520. AR Tab 13, at 360. "Where an agency announces an intention to order from an existing GSA Schedule contractor, it means that the agency intends to order all items using GSA FFS procedures and that all items are required to be within the scope of the vendor's FSS contract." IDEA Int'l, Inc. v. United States (IDEA Int'l), 74 Fed. Cl. 129, 139 (2006).

Although the government is required to order items that fall "within the scope of the vendor's FSS contract," id., there is "no prohibition[] on the government's common sense identification of overlapping, related labor categories," Career Training Concepts, Inc. v. United States (Career Training), 83 Fed. Cl. 215, 227 (2008). In Career Training the court rejected plaintiff's protest based on its finding that the awardee's job category was "sufficiently close to the [FSS labor category] to be compliant with the solicitation." Id. at 228. Although job titles and qualifications may differ between an offeror's FSS contract and the solicitation, a government agency may find that the services offered are within the scope of an offeror's FSS contract if the function of the two job positions is "sufficiently close." Career Training, 83 Fed. Cl. at 228; see Data Mgmt. Servs. Joint Venture v. United States, 78 Fed. Cl. 366, 378 (2007).[19]

---

[18] During oral argument plaintiff asserted that Ofori's proposal included two positions that were not priced and which were not part of Ofori's FSS Schedule. Oral Argument of August 3, 2010, Argument of Mr. Murdock, 2:15:41-56. This claim was raised for the first time in oral argument and was not briefed. The court finds plaintiff's contention to be UNTIMELY.

[19] The court in Career Training Concepts, Inc. v. United States (Career Training), 83 Fed. Cl. 215 (2008) and the court in Data Management Services Joint Venture v. United States (Data Management), 78 Fed. Cl. 366 (2007), noted that the protestor also submitted job position titles that differed from its FSS Schedule contract. Career Training, 83 Fed. Cl. at 228; Data Management., 78 Fed. Cl. at 378. Similarly, in its revised proposal, HomeSource listed twenty positions that differed from the positions identified on its Schedule 520 contract. AR Tab 83, at 10,461.

Plaintiff contends that HUD's award to Ofori violated the terms of the Solicitation. Pl.'s Mot. 22. However, in its revised proposal, Ofori detailed how the job descriptions in its proposal correlated to the labor categories in its FSS contract. AR Tab 61, at 3150. For each job position in Ofori's Technical Proposal, Ofori provided a corresponding FSS labor category. Id. The government need only determine that the function of the job category listed in the Solicitation is sufficiently close to the service offered in the vendor's FSS contract. See Career Training, 83 Fed. Cl. at 227. Ofori demonstrated to the government how each of the proposed job descriptions was derived from its FSS contract by stating which FSS labor category would provide the necessary employee type. See AR Tab 61, at 3150. Ofori therefore provided sufficient information to HUD to allow the TET and the SSO to conclude, rationally and in accordance with law, that Ofori proposed to provide services "sufficiently close," Career Training, 83 Fed. Cl. at 228, to the services offered on its FSS Schedule 520 contract.

A record of the TET's evaluation of the vendors' 520 Schedules and its analysis of the functional equivalence of FSS contract services and proposal services would have been helpful. Nevertheless, "[c]ontracting officers are not obligated by the APA to provide written explanations for their actions." Impresa, 238 F.3d 1337. Moreover, agency actions are entitled to a presumption of "regularity." Id. at 1338. Although the record regarding the TET's evaluation of vendor's FSS contracts is not as detailed as perhaps it could have been, the AR provides sufficient information to demonstrate a rational basis for the government's determination that Ofori's job positions were within the scope of its FSS contract labor categories. See AR Tab 61, at 3150. Because HomeSource has not demonstrated that the government's determination regarding Ofori's FSS contract was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law," 5 U.S.C. § 706(2)(A), HomeSource cannot establish that it suffered any prejudice as a result of HUD's award to Ofori. For the foregoing reasons, plaintiff's Motion with respect to FSS contracts is DENIED and defendant's Motion with respect to FSS contracts is GRANTED.

IV.     Injunctive and Declaratory Relief

To obtain a temporary restraining order (TRO) or a preliminary injunction, plaintiff must establish:  (1) the likelihood of plaintiff's success on the merits of its complaint; (2) whether plaintiff will suffer irreparable harm if the procurement is not enjoined; (3) whether the balance of hardships tips in the plaintiff's favor; and (4) whether a preliminary injunction will be contrary to the public interest. ES-KO, Inc. v. United States, 44 Fed. Cl. 429, 432 (1999) (citing FMC Corp. v. United States, 3 F.3d 424, 427 (Fed. Cir. 1993)). "'When deciding if a TRO is appropriate in a particular case, a court uses the same four-part test applied to motions for a preliminary injunction.'" OAO Corp. v. United States, 49 Fed. Cl. 478, 480 (2001)) (quoting W & D Ships Deck

28

Works, Inc. v. United States, 39 Fed. Cl. 638, 647 (1997)).  To obtain a permanent injunction a plaintiff must succeed on the merits and demonstrate:  "(1) that it will suffer irreparable harm if injunctive relief is not awarded; (2) that granting the relief serves the public interest; and (3) that the harm to be suffered by it outweighs the harm to the Government and third parties."  United Int'l Investigative Servs., Inc. v. United States, 41 Fed. Cl. 312, 323 (1998) (citing FMC Corp. v. United States, 3 F.3d 424, 427 (Fed. Cir. 1993)); see Acumed LLC v. Stryker Corp., 551 F.3d 1323, 1327 (Fed. Cir. 2008); ATA Defense Indus., Inc. v. United States, 38 Fed. Cl. 489, 505 n.10 (1997) ("[the] factors are the same as those considered for a preliminary injunction").

Because the court has determined that plaintiff neither has standing to bring its case nor any basis to succeed on the merits of its complaint, plaintiff is entitled to no injunctive relief.  See supra Parts III.B (discussing plaintiff's lack of standing) and III.C (discussing the merits of plaintiff's complaint).  Plaintiff's requests for a temporary restraining order and an injunction are therefore DENIED.

V.      Conclusion

For the foregoing reasons the court DENIES plaintiff's Motion, GRANTS defendant's Motion, GRANTS BLB's Motion, GRANTS HomeTelos's Motion and GRANTS Ofori's Motion.  The Clerk of Court is directed to ENTER JUDGMENT in favor of defendant.  Because defendant's Motion is granted, all outstanding motions for relief by plaintiff are MOOT, including, without limitation, the relief sought in filings with the following docket numbers:  4, 5, 27 and 28.  No costs.


IT IS SO ORDERED.

s/ Emily C. Hewitt
EMILY C. HEWITT
Chief Judge